# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SOTIRIOS STAMATIS, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| ATP MEDIA OPERATIONS LTD., | |
| Defendant. | |

Dated: March 20, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (BBO # 716245)
Max S. Roberts (*Pro Hac Vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
         mroberts@bursor.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................1

FACTUAL BACKGROUND .............................................................................................2

    I.      HISTORY AND OVERVIEW OF THE VPPA ...................................................2

    II.     DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER ................................3

    III.    DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PERSONALLY
           IDENTIFIABLE INFORMATION TO THIRD PARTIES ...................................4

        A.     Testing Reveals that Defendant Illegally Shares Users' PII and Video-
               Viewing Information with Third Parties.........................................................4

              (i)     Defendant Discloses Class Members' PII and Video-Viewing
                      Information to Meta ...........................................................................8

              (ii)    Defendant Discloses Class Members' PII and Video-Viewing
                      Information to Google.......................................................................14

              (iii)   Defendant Discloses Class Members' PII and Video-Viewing
                      Information to Bloomreach.............................................................17

               (iv)   Defendant Discloses Class Members' PII and Video-Viewing
                      Information to Mux .........................................................................18

        B.     Defendant Discloses Class Members' PII and Video-Viewing Information
               to Third Parties for the Purposes of Marketing, Advertising, and Analytics
               ....................................................................................................................21

              (i)     Meta Pixel ........................................................................................21

               (ii)    Google Analytics .............................................................................24

               (iii)   Bloomreach Javascript SDK ...........................................................26

               (iv)   Mux Data SDK and API ...................................................................28

         C.     Defendant Knowingly Discloses Class Members' PII and Video-Viewing
                Information to Meta, Google, Bloomreach, and Mux ...............................30

    VIII.    EXPERIENCE OF PLAINTIFF ........................................................................32

PARTIES ..........................................................................................................................34

JURISDICTION AND VENUE ........................................................................................34

CLASS ALLEGATIONS ..................................................................................................35

CAUSES OF ACTION .....................................................................................................37

PRAYER FOR RELIEF ....................................................................................................40

JURY TRIAL DEMAND ..................................................................................................40

Plaintiff Sotirios Stamatis ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action suit brought against Defendant ATP Media Operations Ltd. ("ATP" or "Defendant"), for violating the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2.      The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

3.      The VPPA imposes civil liability on "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710.

4.      Defendant operates "Tennis TV[, t]he [o]fficial [s]treaming [s]ervice of the ATP [(Association of Tennis Professionals)] Tour."[1]  "Tennis TV is ATP Media's direct-to-consumer digital subscription service … and delivers a rich tennis streaming experience to a global audience, all year round from every ATP Tour tournament."[2]

---

[1] TENNIS TV, ABOUT US, https://www.tennistv.com/live-atp-streaming.

[2] ATP MEDIA, WHAT WE DO, https://www.atpmedia.tv/expertise.

5.      "Designed for tennis fans[,]" Tennis TV viewers can "[w]atch full match replays as soon as they are published, plus a range of match and tournament highlights[.]"  Users can also "access [Tennis TV's] huge archive of classics[.]"[3]

6.      Tennis TV is accessible "to fans via computers, mobiles, tablets and streaming devices."[4]

7.      Specifically, Defendant's pre-recorded videos (i.e., match replays, classics, tournament highlights, etc.) may be viewed "on demand"[5] through the Tennis TV website: https://www.tennistv.com/ (the "Website").

8.      Unbeknownst to Plaintiff and Class Members, however, Defendant knowingly and intentionally disclosed Tennis TV users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties.  By doing so, Defendant violated the VPPA.

9.      Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA.

## FACTUAL BACKGROUND

## I.    HISTORY AND OVERVIEW OF THE VPPA

10.      The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record.  Congress responded by passing the VPPA, with an eye toward the digital future.  As Senator Patrick Leahy, who introduced the Act, explained:

---

[3] TENNIS TV, ABOUT US, https://www.tennistv.com/live-atp-streaming.

[4] ATP MEDIA, WHAT WE DO, https://www.atpmedia.tv/expertise.

[5] *Id.*

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (cleaned up).

11.     In 2012, Congress amended the VPPA, and in so doing, reiterated the VPPA's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones."  S. Rep. 112-258, at 2.

12.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

## II.     DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

13.     Defendant operates "Tennis TV" which "is ATP Media's direct-to-consumer digital subscription service[.]"[6]  As such, Tennis TV provides subscribers with a library of thousands of hours of pre-recorded videos.  These include, *inter alia*, "full [tennis] match replays

---

[6] ATP MEDIA, TENNIS TV, https://www.atpmedia.tv/expertise/#atp-tennis-tv.

as soon as they are published, plus a range of match and tournament highlights[,]" Tennis TV's "huge archive of classics[,]" and "every ATP Tour tournament."[7]

14.    Tennis TV users can register for free or paid subscriptions.  Registering for a free subscription allows users to "watch selected highlights and more."[8]  Registering for a paid ("Premium") subscription allows for "unlimited access to live matches and replays."[9]  A Premium subscription costs $16.99 per month, $79.99 for six months, or $134.99 for the year.[10]

15.    To create either a free or paid subscription, individuals are required to provide their first and last name, date of birth, country, and email address.[11]

16.    Tennis TV launched in 2006[12] and is widely utilized throughout both Massachusetts and the entirety of the United States.  On information and belief, there have been approximately six hundred three thousand two hundred thirty-two (603,232) visits from the United States in the past month.[13]

## III.   DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES

### A.   Testing Reveals that Defendant Illegally Shares Users' PII and Video-Viewing Information with Third Parties

17.    Prior to the commencement of this action, Plaintiff's counsel retained a private research company to conduct a dynamic analysis of the Website.  A "dynamic analysis" records the transmissions that occur from a user's device.

---

[7] TENNIS TV, ABOUT, https://www.tennistv.com/live-atp-streaming.

[8] TENNIS TV, REGISTER, https://www.tennistv.com/register.

[9] *Id.*

[10] TENNIS TV, SUBSCRIBE | CHOOSE YOUR PLAN, https://www.tennistv.com/subscribe.

[11] TENNIS TV, REGISTER, https://www.tennistv.com/register.

[12] ATP MEDIA, TENNIS TV, https://www.atpmedia.tv/expertise/#atp-tennis-tv.

[13] *See* SIMILARWEB, TENNISTV.COM WEBSITE PERFORMANCE, https://pro.similarweb.com/#/digitalsuite/websiteanalysis/overview/website-performance/*/999/3m?webSource=Total&key=tennistv.com (last accessed Mar. 19, 2025).

4

18.    The private researchers tested what information (if any) Defendant discloses when a user watches a pre-recorded video on the Tennis TV Website.

19.    The analysis revealed that Defendant discloses information sufficient to identify specific Class Members and the specific videos they watched to at least four third parties: Meta Platforms, Inc. ("Meta"); Google LLC ("Google"); Bloomreach, Inc. ("Bloomreach"), and Mux, Inc. ("Mux").

20.    These disclosures were effectuated through, *inter alia*, the third parties' respective tracking pixels and/or tracking libraries: Google Analytics,[14] the Meta Pixel,[15] the Bloomreach Javascript SDK,[16] and the Mux Data SDK and API.[17]

21.    Per a research paper presented at the Association for Computing Machinery Web Conference 2023, "[a tracking pixel] is a piece of JavaScript code added to a website as a graphic element[, ] 1 × 1 pixel [in size,] that is loaded when a user lands on the website hosting it."[18] "When a user visits a [tracking pixel]-enabled website, an instance of the [tracking] pixel loads in the HTML code of the page on the browser."[19] "[I]f a corresponding … cookie does not exist

---

[14] GOOGLE, ANALYTICS OVERVIEW, https://marketingplatform.google.com/about/analytics/.

[15] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel/; META, WHAT IS THE META PIXEL?, https://www.facebook.com/business/tools/meta-pixel.

[16] BLOOMREACH, JAVASCRIPT SDK, https://documentation.bloomreach.com/engagement/docs/js-sdk.

[17] *See* MUX, MAKE YOUR DATA ACTIONABLE WITH METADATA, https://www.mux.com/docs/guides/make-your-data-actionable-with-metadata.

[18] Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs* (Apr. 2023) at 2, https://arxiv.org/pdf/2208.00710. Note, this article specifically describes the Meta Pixel, but Google Analytics and the Meta Pixel's mechanics and functions are substantially similar.

[19] *Id.*

on the browser, one is created and a unique ID is saved[.]"[20]  Then, the tracking pixel's "embedded [] URL point[s] to [a third party's (i.e., Meta, Google)] servers[] … [and] report[s] to [the third party (i.e., Meta, Google)] the user['s] activity for the duration of the visit[,]" along "with [the] specific ID reflecting the specific [website user. This] can be used [] to track [] audiences for brand ads[.]"[21]

22.     To implement a tracking pixel, a website administrator simply places on their website "[t]he [b]ase [tracking p]ixel code[, which] is a small segment of JavaScript code [that] acts as an 'initiator' for the [tracking p]ixel['s] behavior."[22]  Once active, this code will load "a library of functions [(i.e., fbevents.js for the Meta Pixel; analytics.js, gtag.js, and/or ga.js for Google Analytics)] … on the website[.] … [These] librar[ies are] the core mechanism[s] of the [respective tracking p]ixel[s]."[23]  In addition, "the webpage administrator [] define[s] … the behavior they wish to track and report to [Meta, Google], by defining *events*, i.e., actions, that a user takes on the website."[24]  When in use, the tracking pixels then "report[] to [Meta, Google] information about [each] event and [the] user that caused it," for Meta's and Google's "future use in ad-conversion and further user profiling and tracking[.]"[25]

23.     "An SDK is a set of platform-specific building tools" that "offer[s] a variety of functionalities."[26]  For example, an SDK "may help a company evaluate data" or "may be used

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs* (Apr. 2023) at 2, https://arxiv.org/pdf/2208.00710.

[24] *Id.*

[25] *Id.*

[26] Daniel Goldberg & Rick Borden, *Regulators and Litigators are Investigating Data Flows Through SDKs – An Overview and Practical Steps to Reduce Risk*, TECHNOLOGY LAW,

for monetization purposes, including content personalization and targeted advertising."[27]  In

other words, SDKs make data usable.  An API "enables software applications to communicate

with each other to exchange data, features and functionality."[28]  The "[k]ey [c]omponents of an

API" include (i) "the type of request[]" such as "GET (Retrieve data)[,]" "POST (Send data)[,]"

"PUT (Update data)[,]" and "DELETE (Remove data)[;]" (ii) the "[e]ndpoint[]" or "URL where

the API is hosted[,]" and (iii) "[q]uery parameters[,]" or, "[a]dditional data sent to the API to

customize requests."[29]

24.     Defendant operates the Tennis TV Website.  Defendant intentionally and

knowingly integrated the Meta Pixel, Google Analytics, Bloomreach Javascript SDK, and Mux

Data SDK and API into the Tennis TV Website.

25.     The dynamic analysis found that when a Tennis TV Website user creates an

account and watches a pre-recorded video on the Tennis TV Website, Defendant discloses the

following information to Meta, Google, Bloomreach, and Mux[30]:

//

//

---

FRANKFURT KURNIT KLEIN + SELZ PC (Aug. 23, 2023),
https://technologylaw.fkks.com/post/102imku/regulators-and-litigators-are-investigating-data-
flows-through-sdks-an-overview.

[27] *Id.*

[28] Michael Goodwin, *What is an API (application programming interface)?*, IBM (Apr. 9, 2024),
https://www.ibm.com/think/topics/api.

[29] NonCoderSuccess, *API vs SDK: Understanding the Difference with Examples*, MEDIUM (Dec.
9, 2024), https://noncodersuccess.medium.com/api-vs-sdk-understanding-the-difference-with-
examples-dc5a34fc049c.

[30] Mux appears as "Litix" in the table because Mux owns the domain "litix.io."  *See* WHO.IS,
LITIX.IO, https://who.is/whois/litix.io.  *See also* MUX, MAKE YOUR DATA ACTIONABLE WITH
METADATA ("When the master playlist is loaded into a video player integrated with a Mux Data
SDK that supports extracting Session Data, the Session Data keys that use the io.litix.data prefix
will be included in the Mux Data view ....").

## Summary of Third-Party Exfiltration

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Google Analytics** | Video Title, ID, URL | Email (hashed) | CID |
| **Bloomreach** | Video Title, ID, URL | Email | Page visiting time |
| **Facebook** | Video Title, ID, URL, Video Events | *via Token* | Auth Token*, FBP |
| **Litix** | Video Title, ID, URL | *via Token* | Auth Token* |

(i) *Defendant Discloses Class Members' PII and Video-Viewing Information to Meta*

26.     The dynamic analysis found that when a Tennis TV user watches a pre-recorded video on the Website, Defendant discloses to Meta, via the Meta Pixel and a login token, explained *infra*, the user's (i) email and full name, (ii) "Facebook browser ID value [] stored in the _fbp browser cookie[,]"[31] and (iii) the title, ID and URL of the video the user is watching, including "event data"/video interactions.  This is evinced by the following network transmissions from the Tennis TV Website:



### Third Party: Meta (Facebook)

**Facebook** is a social media and social networking service owned by the American technology conglomerate Meta.

We observed **Meta (Facebook)** obtaining:

**Video Information** in the form of:
- Video Title
- Video ID
- Video URL*
- Video Events

**Personal Information** in the form of:
- Email (Token, Base64 encoded)
- Full Name (Token, Base64 encoded)

**Other Information** such as:
- FBP

---

[31] META, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com /docs/marketing-api/conversions-api/parameters/customer-information-parameters/.  *See also* META, CLICKID AND THE FBP AND FBC PARAMETERS, https://developers.facebook.com/docs/marketing-pi/conversions-pi/parameters/fbp-and-fbc.





27. Defendant generates a login token ("Token") for its users who subscribe to Tennis TV. Tokens enable subscribers to "access the website … the token has been issued for, rather than having to re-enter credentials each time they go back to the same webpage … protected with

that same token."[32]

28.    The Token is delivered in Base64 language. Base64 is a computer language known as "Hacker Pig Latin."[33]  This computer language is designed to carry and easily transfer data between sources by compressing the data into a simple, long string of plain text.

29.    Unfortunately for the privacy rights of Tennis TV subscribers, by publishing the login Token in Base64 instead of encrypting this information, Defendant makes consumer's email addresses readily translatable into English.  Just as any ordinary person can cut-and-paste Spanish text into Google Translate to figure out what it means in English, any ordinary person can cut and paste Base64 text into any one of a myriad of Base64 decoding websites and figure out what the Base64 text means.  Therefore, even though Defendant shares Plaintiffs and Class Members' email addresses with Meta in Base64, the email addresses are personally *identifiable* information because the email addresses are easily translated into English and can be used to identify a subscriber.

30.    The Token contains the email address and full name of the website users.  The passed Token—containing Website users' PII—is leaked to trackers via the Tennis TV website.

31.    That Defendant discloses to Meta, via the Token, the user's e-mail address and full name in Base64 is shown by the blue highlights.  The blue highlights also show the email and full name that have been easily decoded from the information.

//

//

---

[32] OKTA, WHAT IS TOKEN-BASED AUTHENTICATION?, https://www.okta.com/identity-101/what-is-token-based-authentication/.

[33] Daniel Smallwood, *Hacker Pig Latin: A Base64 Primer for Security Analysts*, DARK READING (Jan. 21, 2021), available https://www.darkreading.com/cybersecurity-analytics/hacker-pig-latin-a-base64-primer-for-security-analysts (last accessed Dec. 19, 2023).

**Original Base64**

cd[buttonFeatures]: {"classList":"packages__item-button
button","destination":"https://atppayments.streamamg.com/sso/startbasket/92af71e7-912a-4c89-8254-d0073995620e?lang=en&apijwttoken=eyJhbGciOiJSUzI1NiIsInR5cCIgOiAiSldUIiwia2lk
IiA6ICJBN2RMb0g3NjNtQ05PMDhJbU45d1FVbl1QaF9UOF9US1pjSmZKY1l2LThvIn0.eyJleHAiOjE3MzgzNTU
3NTIsImlhdCI6MTczODM1NDg1MiwiYXV0aF90aW11IjoxNzM4MzU0ODUxLCJqdGkiOiI0MDQ3YWMzOS1hMWIwLT
RlOTctOGE4NC0xYTBiNjE4MWQ4NzgiLCJpc3MiOiJodHRwczovL3Nzby50ZW5uaXN0di5jb20vYXV0aC9yZWFsb
XMvVGVubmlzVFYiLCJhdWQiOiJhY2NvdW50Iiwic3ViIjoiMjZlYmI0ZGQtY2Y3Zi00ZDk4LThmMTgtNTdhZDEy
N2RmZjA3IiwidHlwIjoiQmVhcmVyIiwiYXpwIjoidGVubmlzLXR2LXdlYiIsIm5vbmNlIjoiYzAxOTViZGEtZDQ1
1ZC00YzJhLTg5M2QtYmMzYzc0NjQ5MDJjIiwic2Vzc2lvbl9zdGF0ZSI6IjcxYjMwWTY0LTEzOGUtNDYzMi1hMG
RjLTk2Y2IxNDg1Y2Q1NiIsImFjci6I6IjEiLCJhbGxvd2VkLW9yaWdpbnMiOlsiaHR0cHM6Ly93d3cudGVubmlzd
HYuY29tIiwiaHR0cHM6Ly90dHYucHJvZC5hdHBtZWRpYS5wdXJlbGl2ZS5jb20iLCJodHRwczovL3Rlbm5pc3R2X
di5jb20iLXSwicmVhbG1fYWNjZXNzIjp7InJvbGVzIjpbImRlZmF1bHQtcm9sZXMtdGVubmlzdHYiLCJvZmZsaW5
lX2FjY2VzcyIsInVtYV9hdXRob3Job3aXphdGlvbiJdfSwicmVzb3VyY2VfYWNjZXNzIjp7ImFjY291bnQiOnsicm9sZXMi
OlsibWFuYWdlLWFjY291bnQiLCJtYW5hZ2UtYWNjb3VudC1saW5rcyIsInZpZXctcHJvZmlsZSJdfX0sInNjb3Bl
IjoiY29uZW5pZCBwcm9maWxlIGVtYWlsIiwiZW1haWxfdmVyaWZpZWQiOnRydWUsIm5hbWUiOiJQZW5lbG9wZSBT
cmlja2xhbmQiLCJwcmVmZXJyZWRfdXNlcm5hbWUiOiJibGlhbGFtYW1hbWFAZ21haWwuY29tIiwiZ2l2ZW5fbmFt
ZhJbpMpDag3PASRIsB-HLuMuHoWYTt1nYQdjF2RCDQHkzj9te7v79a3dTJjrtKnQZLAuOFJO3HAJkNSbg3GNDxk
XDXvp4LnPA5HUQxOKe_TWdPWieXu-F5dipAyjBJwcVBL11u9DloNZ8g0dCNCm-a4NNIRexYEdQ&_gl=1*1c2nvo
3*_ga*MTAzNDI3MTExLjE3MzgzNTQ2OTU.*_ga_9QQPGQR8H0*MTczODM1NDY5NC4xLjEuMTczODM1NDg1My40O
S4wLjEyNzYzMzMzMTI.","id":"","imageUrl":"","innerText":"$16.99 /
MonthlyFlexible","numChildButtons":1,"tag":"0","type":null "name":""}



**Decoded Plaintext**

ttps://www.tennistv.com", "https://ttv.prod.atpmedia.purelive.com", "https://tennistv.co
m"],"realm_access":{"roles":["default-roles-tennistv","offline_access","uma_authorizati
on"]} "resource_access":{"account":{"roles":["manage-account","view-profile"]}} "scope"
:"openid profile email","email_verified":true,"name":"Penelope
Strickland","preferred_username":"blimalamamama@gmail.com","given_name":"Penelope","fam
ily_name":"Strickland","email":"blimalamamama@gmail.com"}.nxGpyVEFolXHNZk0jnNuiZKdA1Iwf
5EUkr4y_yIUodeQiuw1Nhk-CbKgLoMmSFRnIdDimSmSwN0Qwbm2SJBMlhb5804mTR
WlodNUTPNzVGZWerhQmUail×Bq09-FWmXUWn-ANv7UpkZalkncyN-Kzwnh8v8Mkia7bJbnMnDao3PASRIsB-HLu

32.    An e-mail address is a unique string of characters which designate an electronic

mailbox.  As industry leaders,[34] trade groups,[35] and courts[36] agree, an ordinary person can use an

---

[34] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[35] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2020), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[36] *See United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

e-mail address to uniquely identify another individual.  Indeed, there exist multiple services that enable their clients to look up who owns a particular e-mail address.[37]

33.     That Defendant discloses to Meta, via the Meta Pixel, the user's Facebook browser ID value stored in the _fbp browser cookie is shown by the red highlights.

```
  cd[pageFeatures]: {"title":"Tennis TV Subscription - Join the Official ATP Streaming
Service"}
  …
  fbp: fb.1.1738354852238.509269350389523216
  …
```

```
  cd[pageFeatures]: {"title":"Tennis TV Subscription - Join the Official ATP Streaming
Service"}
  …
  fbp: fb.1.1738354852238.509269350389523216
  …
```

```
  ec: 4
  o: 4126
  fbp: fb.1.1738354852238.509269350389523216
  cs_est: true
  ler: other
```

34.     Per the Meta "Cookies Policy," the "'_fbp' cookie *identifies browsers* for the purposes of providing advertising and site analytics services[.]"[38]  Indeed, the browser ID value, along with other "customer information parameters[,]" is ultimately "matched to Meta accounts."[39]  Thus, through the Facebook browser ID value, an ordinary person can easily identify a specific user, as well as which specific user watched what video(s).  Here, the "Facebook browser ID value" was "fb.1.1738354852238.509269350389523216."  According to Meta, browser ID values are formatted as "fb.${subdomain_index}.${creation_time}.$

---

[37] *See*, *e.g.*, EXPERIAN IDENTITY APPEND, https://docs.experianaperture.io/identity-append/experian-identity-append/overview/introduction/#reverse-email-append ("Reverse email append … allows you to input an email address and receive the name and address of the individual associated with that email.").

[38] META, COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies (emphasis added).

[39] FACEBOOK, ABOUT EVENT MATCH QUALITY, https://www.facebook.com/business/help/765081237991954.

{random_number}."[40] Thus, the transmission includes the random, identifying number

"509269350389523216."

35.     That Defendant discloses to Meta, via the Meta Pixel, the title, ID, and URL of

the video the user is watching, including "event data"/video interactions, is shown by the yellow

highlights.  Here, the title of the video was "Alexander Bublik vs Aleksandar Kovacevic

Highlights."  The URL of the video was "https://www.tennistv.com/videos/4208798/montpellier-

2025-qf-bublik-kovacevic-highlights."  The Meta Pixel also received "event data"/a video

interaction titled "Mute," showing that the user watched the video with the volume on mute.

```
GET https://www.facebook.com/tr/

URL PARAM:
  id: 515094145301711
  ev: SubscribedButtonClick
  dl:
https://www.tennistv.com/videos/4208798/montpellier-2025-qf-bublik-kovacevic-hi
ghlights
  rl: https://atppayments.streamamg.com/
  if: false
  ts: 1738355020438
  cd[buttonFeatures]: {"classList":"bmpui-ui-volumetogglebutton
bmpui-muted","destination":"","id":"bmpui-id-903","imageUrl":"url(\"https://www
.tennistv.com/resources/v2.5.7/i/elements/svgs/volume-mute.svg\")","innerText":
"Mute","numChildButtons":0,"tag":"button","type":"button","name":"","value":""}
  cd[buttonText]: Mute
  cd[formFeatures]: []
  cd[pageFeatures]: {"title":"Alexander Bublik vs Aleksandar Kovacevic
Highlights"}
  cd[parameters]: []
  sw: 1512
```

36.     Although Defendant discloses a user's video-viewing information to Meta in a

separate transmission from the user's Base64 encoded full name and e-mail address, an ordinary

person can still easily link the two transmissions and identify which user watched what video(s).

---

[40] META, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com
/docs/marketing-api/conversions-api/parameters/customer-information-parameters/.

This is because the two transmissions to Meta contain the same "Facebook browser ID value" (here, "fb.1.1738354852238.509269350389523216"), which is "matched to Meta accounts."[41]

  (ii)  *Defendant Discloses Class Members' PII and Video-Viewing Information to Google*

37.    As summarized above, the dynamic analysis found that when a Tennis TV user watches a pre-recorded video on the Website, Defendant discloses to Google, via Google Analytics, the user's (i) hashed e-mail address, (ii) Google Analytics client ID ("a unique identifier [(i.e., string of numbers)] associated with each user" used "for Google Analytics to determine which traffic belongs to which user"[42]), and (iii) the title, ID, and URL of the video the user is watching.  This is evinced by the following network transmissions from the Tennis TV Website:





38.    That Defendant discloses to Google, via Google Analytics, the user's hashed e-mail address is shown by the blue highlights.

```
tld: G-9QQPGQR8H0
gtm: 45je51u0v886380199z8854615122za200zb854615122
_p: 1738354844694
em: tv.1~em.T9mRGUWCdPYIcHS2XL7lRrCJ-dhYHxsKKR-WiE3BjaU
gcs: G111
gcd: 13r3r3r5l1
```

39.    Although Defendant discloses SHA-256 hashed[43] e-mail addresses, the reality is that "the match between your email and its hash is probably already circulating widely and companies are marking money from it."[44]  Given the availability online of such "leaked" email/hashed email matches, entities are merely "pretend[ing]to protect your privacy"[45] through SHA-256 and/or other hashing algorithms.

40.    The Federal Trade Commission has warned companies for over a decade—including as recently as July 24, 2024—that hashing is an insufficient method of anonymizing information.[46]

---

[43] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash.

[44] PIXEL DE TRACKING, GUERLAIN (LVMH): LUXURY AND SURVEILLANCE, https://www-pixeldetracking-com.translate.goog/fr/votre-email-comme-vecteur-de-surveillance-ultime-illustration-avec-guerlain?_x_tr_sl=fr&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

[45] *Id.*

[46] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024) ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

41.     Google, itself, informs advertisers who wish to "target[ ] Customer Match segments in [] Google Ads campaigns[]" that "Google keeps track of the email addresses and phone numbers for Google accounts and the corresponding hashed strings for those email addresses or phone numbers."[47]  Accordingly, Google can compare "each hashed string on [a given email] list with the hashed string for email address or phone number of Google accounts[]" to determine "[i]f there's a match[ with a] … corresponding Google account[.]"[48]

42.     Thus, even in hashed form, email addresses are traceable to individuals.

43.     A Google Analytics client ID is "[a] randomly generated value for each user" that "identifies a browser instance" and has a "two-year expiration."[49]

44.     That Defendant discloses to Google, via Google Analytics, the user's Google Analytics client ID is shown by the red highlights.

```
102067808~102081485~102123608~1
  gdid: dYWJhMj
  cid: 103427111.1738354695
  ecid: 1276333612
```
```
102067808~102081485~102123608~1
  gdid: dYWJhMj
  cid: 103427111.1738354695
  ecid: 1276333612
```

45.     That Defendant discloses to Google, via Google Analytics, the title and URL of the video the user is watching, is shown by the yellow highlights.  Here, the title of the video was "Alexander Bublik vs Aleksandar Kovacevic Highlights."  The ID of the video was "4193152." The URL of the video was "https://www.tennistv.com/videos/4208798/montpellier-2025-qf-bublik-kovacevic-highlights."

```
  dl:
https://www.tennistv.com/videos/4208798/montpellier-2025-qf-bublik-kovacevic-hi
ghlights
  dr: https://atppayments.streamamg.com/
  dt: Alexander Bublik vs Aleksandar Kovacevic Highlights
  en: scroll
```

---

[47] GOOGLE, ABOUT THE CUSTOMER MATCHING PROCESS, https://support.google.com/google-ads/answer/7474263.

[48] *Id.*

[49] GOOGLE ANALYTICS, CONFIGURATION, https://developers.google.com/analytics/devguides/collection/ga4/reference/config#client_id.

46.    Although Defendant discloses a user's video-viewing information to Google in a separate transmission from the user's hashed e-mail address, an ordinary person can still easily link the two transmissions and identify which user watched what video(s).  This is because the two transmissions to Google contain the same Google Analytics client ID (here, "103427111.1738354695"), specifically "for Google Analytics to determine which traffic belongs to which user[.]"[50]

> *(iii) Defendant Discloses Class Members' PII and Video-Viewing Information to Bloomreach*

47.    The dynamic analysis found that when a Tennis TV user watches a pre-recorded video on the Website, Defendant discloses to Bloomreach, via the Bloomreach Javascript SDK, the user's (i) email address, (ii) ID and URL of the video the user is watching, and (iii) the amount of time the user has spent on the website page.  This is evinced by the following network transmissions from the Tennis TV Website:



---

[50] GOOGLE, [UA] HOW USERS ARE IDENTIFIED FOR USER METRICS [LEGACY], https://support.google.com/analytics/answer/2992042.

48.    That Defendant discloses to Bloomreach, via the Bloomreach Javascript SDK, the user's email address is shown by the blue highlight.

```
"name": "crm/events",
"data": {
    "customer_ids": {
        "email_id": "blimalamamama@gmail.com",
        "sso_id": "26ebb4dd-cf7f-4d98-8f18-57ad127dff07",
        "cookie": "21adda79-8284-459e-9798-cfd3f2b339be"
```

49.    That Defendant discloses to Bloomreach, via the Bloomreach Javascript SDK, the ID and URL of the video the user is watching, is shown by the yellow highlights.  Here, the ID of the video was "4193152."  The URL of the video was "https://www.tennistv.com/videos /4193152/jeddah-2024-tournament-review."

```
        "properties": {
            "location":
"https://www.tennistv.com/videos/4193152/jeddah-2024-tournament-review",
            "os": "Mac OS X",
            "browser": "Chrome",
            "device": "Other",
            "referrer": "",
            "path": "/videos/4193152/jeddah-2024-tournament-review",
            "activity": "move",
            "cookie": "21adda79-8284-459e-9798-cfd3f2b339be"
```

50.    That Defendant discloses to Bloomreach, via the Bloomreach Javascript SDK, the amount of time the user has spent on the website page, is shown by the red highlight.

```
            "type": "session_ping",
            "age": 0.11399984359741211,
            "properties": {
```

(iv) *Defendant Discloses Class Members' PII and Video-Viewing Information to Mux*

51.    The dynamic analysis found that when a Tennis TV user watches a pre-recorded video on the Website, Defendant discloses to Mux, via the Mux Data SDK and API and the Token, the user's (i) email and full name, and (ii) the title, ID, and URL of the video the user is

watching, including "event data"/video interactions.  This is evinced by the following network

transmissions from the Tennis TV Website:





52.     That Defendant discloses to Mux, via the Token, the user's e-mail address and

full name in Base 64 is shown by the blue highlights.  Even though Defendant shares Plaintiffs

and Class Members' email addresses with Mux in Base64, the email addresses are personally

identifiable information because the email addresses are easily translated into English and can be used to identify a subscriber.  *See supra*, Sec. III(A).  Indeed, the blue highlights also show the email and full name that have been easily decoded from the information.

**Original Base64**

'https://open.http.mp.streamamg.com/p/3001482/sp/300148200/playManifest/entryId/0_6cevx rk3/format/applehttp/protocol/https/a.m3u8?ks=eyJhbGciOiJSUzI1NiIsInR5cCIgOiAiSldUIiwia 2lkIiA6ICJBN2RMb0g3NjNtQ05PMDhJbU45d1FVbllQaF9UOF9US1pjSmZKY1l2JSmZKY1l2LThvIn0.eyJleHAiOjE3Mzgz NTU3NTIsImlhdCI6MTczODM1NDg1MiwiYXV0aF90aW1lIjoxNzM4MzU0ODUxLCJqdGkiOiI0MDQ3YWMzOS1hMWI wLTRlOTctOGE4NC0xYTBiNjE4MWQ4NzgiLCJpc3MiOiJodHRwczovL3Nzby50ZW5uaXN0di5jb20vYXV0aC9yZW FsbXMvVGVubmlzVFYiLCJhdWQiOiJhY2NvdW50Iiwic3ViIjoiMjZlYmI0ZGQtY2Y3Zi00ZDk4LThmMTgtNTdhZ DEyN2RmZjA3IiwidHlwIjoiQmVhcmVyIiwiYXpwIjoidGVubmlzLXR2LXdlYiIsIm5vbmNlIjoiYzAxOTViZGEt ZDQ1ZC00YzJhLTg5M2QtYmMzYzc0NjQ5MDJjIiwic2Vzc2lvbl9zdGF0ZSI6IjcxYjMwMTY0LTEzCGUtNDYzMi1 hMGRjLTk2Y2IxNDg1Y2Q1NiIsImFjciI6IjEiLCJhbGxvd2VkLW9yaWdpbnMiOlsiaHR0cHM6Ly93d3cudGVubm lzdHYuY29tIiwiaHR0cHM6Ly90dHYucHJvZS5hdBtZWRpY5S5wdWxzZWxpbmUiY29tIiwiaHR0cHM6Ly90ZW5ua XN0di5jb20iXSwicmVhbGG1fYWNjZXNzIjp7InJvbGVzIjpbImRlZmF1bHQtcm9sZXMtdGVubmlzdHYiLCJvZmZs aW5lX2FjY2VzcyIsInVtYV9hdXRob3JpemF0aW9uIl19fQ.LCJyZXNvdXJjZV9hY2Nlc3MiOnsiYWNjb3VudCI6eyJ yb2xlcyI6WyJtYW5hZ2UtYWNjb3VudCIsInZpZXctcHJvZmlsZSJdfX0sInNjb3BlbmlkIHByb2ZpbGUgZWZ1Sl UgZW1haWwiLCJlbWFpbF9Z2XpZmllZCI6dHJ1ZSwibmFtZSI6IlBlbmVsb3BlIF0cm1ja2xhbmQiXCJwcmVmZ XJyZWRfXNlcm5hbWUiOiJibGltYWxhbWFtYWhAZ21haWwuY29tIiwiZ2l2ZW5fbmFtZSI6IlBlbmVsb3BlIiwi ZmFtaWx5X25hbWUiOiJTdHJpY2tsYW5kIiwiZW1haWwiOiJibGltYWxhbWFtYWhAZ21haWwuY29tIn0.nxGp yVEFolXHNZk0jnNuiZKdA1Iwf5EUkr4y_yIUodeQiuw1Nhk-CbKgLoMmSFRnIdDimSmSwN0Qwbm2SJBMlhb5804 mTRNVtN64UjjX_E-uKIyoHNk3WlgdNUIPNzvWZWerbQmUajixBq09-FWmXUWn-ANv7UpkZalkncvN-Kzwnh8y8M kigZhJbpMpDag3PASRIsB-HLuMuHoWYTt1nYQdjF2RCDQHkzj9te7v79a3dTJjrtKnQZLAuCFJ03HAJkNSbg3GN DxkYPXvp4LnPA5HUQxOKo_TWdPWjeXu-F5dipAyjBJwcVBL11u8DloNZ8g0dCNCm-a4NNIRexYEdQ'}
{ 'mapve': '2.1', 'pinid': '399a6f08-a135-4b8a-96ee-71206ffbce18', 'bdm': 'litix.io',



**Decoded Plaintext**

on"]}, "resource_access":{"account":{"roles":["manage-account","view-profile"]}},"scope" :"openid profile email","email_verified":true,"name":"Penelope Strickland","preferred_username":"blimalamamama@gmail.com","given_name":"Penelope","fam ily_name":"Strickland","email":"blimalamamama@gmail.com"}.nxGpyVEFolXHNZk0jnNuiZKdA1Iwf 5EUkr4y_yIUodeQiuw1Nhk-CbKgLoMmSFRnIdDimSmSwN0Qwbm2SJBMlhb5804mTRNVtN64UjjX_E-uKIyoHNk3

53.    That Defendant discloses to Mux, via the Mux Data SDK and API, the title, ID, and URL of the video the user is watching, including "event data"/video interactions, is shown by the yellow highlights.  Here, the title of the video was "Alexander Bublik vs Aleksandar Kovacevic Highlights."  The ID of the video was "4208798."  The URL of the video was "https://www.tennistv.com/videos/4208798/ montpellier-2025-qf-bublik-kovacevic-highlights." The Mux Data SDK also received "event data"/a video interaction titled "playing," showing that the video was playing.

events: {'mapve': '2.1', … 'pswnm': 'Bitmovin Player', 'pswve': '8.190.0', 'pmxpinm': '', 'pmxpive': '', 'vtt': 'Alexander Bublik vs Aleksandar Kovacevic Highlights', 'uusid': '26ebb4dd-cf7f-4d98-8f18-57ad127dff07', 'vsr': '250', 'vctty': 'match-highlights', 'vsmty': 'on-demand', 'pnm': 'WEB on-demand', 'vid': '4208798', 'c1': 'Montpellier', 'c2': '2025', 'c3': 'match-highlights', 'c4': 'active', 'c5': 'Tennis TV Premium - Monthly (USD)', 'xid': 'fd679a45-8d7a-4b9c-be29-0a4e40de6d81', 'pvwco': 1, 'wloti': 694, … 'mvrid': 'b68e69c3-6ef6-4069-a96f-21abc0f27c49', 'msano': '0.5335359956418568', 'e': 'playerready', 'wur': 'https://www.tennistv.com/videos/4208798/montpellier-2025-qf-bublik-kovacevic-highlights', 'vsour': 'https://open.http.mp.streamamg.com/p/3001482/sp/300148200/playManifest/entryId/0_6ceyx

PWjeXu-F5dipAyjBJwcVBL11u8DloNZ8g0dCNCm-a4NNIRexYEdQ'} {'mapve': '2.1', 'pinid': '399a6f08-a135-4b8a-96ee-71206ffbce18', 'bdm': 'litix.io', 'psqno': 2, 'xsqno': 2, 'pphti': 0, 'uti': 1738354998440, 'ake': 'q0ni5mef6qr71lgeamfllt10o', 'vid': '4208798', 'xid': 'fd679a45-8d7a-4b9c-be29-0a4e40de6d81', 'xwati': 0, 'xtitofifr': 0, 'sex': 1738356498440, 'e': 'playing'} …

### B.  Defendant Discloses Class Members' PII and Video-Viewing Information to Third Parties for the Purposes of Marketing, Advertising, and Analytics

54.     Defendant transmits the foregoing PII and video-viewing information to third parties Meta, Google, Bloomreach, and Mux so that these third parties can help Defendant launch marketing campaigns, target specific users with advertising, and analyze Tennis TV Website user data.

*(i)     Meta Pixel*

55.     According to Meta, "[t]he Meta Pixel is a snippet of JavaScript code that allows [clients] to track visitor activity on [their] website[s]. It works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[51] The Meta Pixel "relies on Facebook cookies, which enable [Meta] to match [] website visitors to their respective Facebook User accounts."[52] Meta offers a menu of "standard events" that can be tracked, including what content a visitor

---

[51] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[52] META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

views or purchases.[53]  Advertisers can also create their own tracking parameters by building a "custom event."[54]

56.    This gathered information is used for marketing and advertising.  Specifically, the Meta Pixel's library of functions can be used to "[t]rack conversions [] in the Ads Manager[,] … to define custom audiences for ad targeting, [and] for Advantage+ catalog ads campaigns[.]"[55]

57.    Taking these one by one, "track[ing ] website visitors' actions[,] also known as conversion tracking[,] ... can be used to analyze the effectiveness of [a] conversion funnel and to calculate [] return[s] on ad investment[s]."[56]  Once a client is "tracking conversions, [Meta] recommend[s] that [the client] use them to … optimize [] ads for website conversions."[57]

58.    A "custom audience is an ad targeting option"[58] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[59]  Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action.  Once [an] ad starts running, [Meta's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right

---

[53] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655.  *See also* META, STANDARD EVENTS, https://developers.facebook.com/docs/meta-pixel/reference.

[54] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[55] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[56] META, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[57] *Id.*

[58] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[59] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

people."[60]  Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers."[61]

59.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed. This allows [Meta clients] to create thousands of ads without having to configure each of them individually."[62]  Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[63]

60.    In short, Meta states[64] that the Meta Pixel can be used to:

- Make sure your ads are shown to the right people. Find new customers, or people who have visited a specific page or taken a desired action on your website.
- Drive more sales. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.
- Measure the results of your ads. Better understand the impact of your ads by measuring what happens when people see them.

61.    Gathered information is also used for analytics.  Namely, the Meta Pixel helps "understand[] the actions people take on [a] website."[65]  "Examples of actions include adding an item to their shopping cart or making a purchase. The pixel receives these actions, or events, which [] can [be] view[ed] on [the] Meta Pixel page in [the Meta] Events Manager. From there,

---

[60] *Id.*

[61] *Id.*

[62] META, META PIXEL FOR ADVANTAGE+ CATALOG ADS, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads.

[63] *Id.*

[64] META, ABOUT META PIXEL, https://www.facebook.com/business/help/ 742478679120153.

[65] *Id.*

[a client will] be able to see the actions that [its] customers take."[66]  This allows Meta clients to "segment [their] website visitors into groups based on the actions they have taken on [their] website."[67]  Additionally, with the Meta Pixel, clients can "[a]dd events on the pages that matter to [their] business to help [] understand [] customers' journey[s].  If [one were to] set up events along their path (for example, from product page views to a purchase) it may help [] measure and optimize [] ads for the conversions that mean the most to [one's] business."[68]

62.     Defendant uses the Meta Pixel for such marketing, advertising, and analytics purposes.

(ii)     *Google Analytics*

63.     According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[69]  Google describes these reports and insights as follows[70]:

> Real-Time Reporting
> - Monitor activity on your site or app as it happens.
>
> Acquisition Reports
> - See how users land on your site or app and understand the effectiveness of your marketing.
>   - User Acquisition[:] Discover how users reach your site or app through different paid and organic sources.
>   - Traffic Acquisition[:] See a session-based view of traffic and engagement on your site or app through different paid and organic traffic sources.

---

[66] *Id.*

[67] META, CUSTOM AUDIENCES, https://developers.facebook.com/docs/meta-pixel/ implementation/custom-audiences.

[68] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005.

[69] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/ answer/12159447.

[70] GOOGLE, ANALYTICS FEATURES, https://marketingplatform.google.com/about/ analytics/features/.

Engagement Reports
- Better understand what content drives engagement and conversions on your site or app.
  - Events Report[:] Get a detailed view of user actions, system events, or errors.
  - Conversion Report[:] See how all your marketing channels are working together to drive conversions.
  - Pages and Screen Report[:] See which web pages and app screens users engage with the most.

Monetization Reports
- See how much revenue your site or app generates whether it's from ecommerce, subscriptions, or ads.
  - Ecommerce[:] Analyze purchase activity including product and transaction information, average purchase revenue, average purchase revenue per user, and other data.
  - In-App Purchases[:] Improve your app monetization with insights about the highest performing products and subscriptions.
  - Publisher Ads[:] See ad revenue that your app generates using the Google Analytics for Firebase SDK.

64.     This gathered information is used for marketing and advertising.  Specifically, Google "Analytics is designed to work seamlessly with other Google solutions and partner products" and can "unlock deeper insights into [advertising] campaign performance from Google Ads, Display & Video 360, and Search Ads 360."[71]  Google Analytics integrates with Google Ads so that clients, like Defendant, can "[s]ee [] Ads data together with [] website and app performance data in the Google Ads reports in Analytics."[72]  Google Analytics integrates with Display & Video 360 and Search Ads so that clients, like Defendant, can "[e]xport conversions created in Analytics[,]" "create audiences that are predicted to take [certain] actions[,]" and "use them for automated bidding" in Display & Video 360 and Search Ads.[73]

65.     Gathered information is also used for analytics.  With Google Analytics, clients,

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

like Defendant, can "apply[] Google's machine learning models, … analyze [] data[,] and predict future actions people may take, like making a purchase or churning."[74]  Additionally, Google Analytics can "automatically detect and surface actionable insights from [gathered] data like important changes, new trends, and other growth opportunities[.]"[75]  And Google can provide "[a]nswers to [marketers' q]uestions … in natural language[,] … to quickly find [] metric[s], report[s], or insights[.]"[76]  Through Google Analytics' "[u]ser [e]xploration" functions, it is even possible to "[s]elect specific groups of users and drill down deeper to understand how those users engage with [a] site or app."[77]

66.    Thus, Google Analytics furnishes "a complete understanding of [] customers across devices and platforms[,] … [and] gives [] the tools[] … to understand customer journey and improve marketing ROI."[78]  Defendant uses Google Analytics for such marketing, advertising, and analytics purposes.

(iii)    *Bloomreach Javascript SDK*

67.    According to Bloomreach, the Bloomreach "Javascript SDK[ ] allows you to integrate your business website with Bloomreach Engagement and track the behavior of customers on your website."[79]

---

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] GOOGLE, ANALYTICS OVERVIEW, https://marketingplatform.google.com/about /analytics/.

[79] BLOOMREACH, JAVASCRIPT SDK, https://documentation.bloomreach.com/engagement/docs/js-sdk.

68.     The Bloomreach Javascript SDK tracks "actions," or "events," of website users. Bloomreach goes on to explain: "Customers in your business do different actions. These actions are called events and by tracking them you gain insights vital for developing the perfect business."[80]

69.     This is done through "setting the[] value" of various SDK "configuration options[.]"[81] Configuration options include "tracking options" such as "track.activity", which "[e]nables tracking of user activity[.]" Configuration options also include "[c]ustomer options" such as "customer", which "[a]llows you to identify your customer."[82]

70.     The Bloomreach "Engagement API enables tracking from websites and other sources." Specifically, the API allows other applications and/or "systems to access the [Bloomreach Engagement] platform and manipulate the system and its data."[83]

71.     The Bloomreach Engagement Platform "is a multi-purpose AI-driven platform" that has various features. Features include but are not limited to "[c]ampaign builder[,]" where clients can "[s]end professional emails, weblayers, and SMS in no time[,]" "[e]xperiments and A/B testing[,]" where clients can "[b]uild different variants of [their] campaigns[,]" and "AI-powered insights[,]" where clients can "[p]redict customer behavior to increase the efficiency of [] campaigns" and "[g]enerate personalized product recommendations for visitors browsing your website."[84]

---

[80] BLOOMREACH, TRACKING, https://documentation.bloomreach.com/engagement/docs/tracking.

[81] BLOOMREACH, JS SDK CONFIGURATION,
https://documentation.bloomreach.com/engagement/docs/configuration.

[82] *Id.*

[83] BLOOMREACH, ABOUT ENGAGEMENT API,
https://documentation.bloomreach.com/engagement/reference/about.

[84] BLOOMREACH, WHAT IS BLOOMREACH ENGAGEMENT?,
https://documentation.bloomreach.com/engagement/docs/what-is-bloomreach-engagement.

72.    "By analyzing customer data, [Bloomreach] can help businesses [like Defendant] identify patterns and trends in customer behavior, allowing [Defendant] to create more targeted and personalized marketing campaigns."[85]  Indeed, Bloomreach boasts that its "analytics and reporting features" are "user-friendly and intuitive" for businesses like Defendant.[86]

73.    Moreover, the Bloomreach "platform provides real-time analytics and insights, so businesses can quickly identify and respond to changes in customer behavior and preferences."[87]

74.    These features allow Bloomreach clients to do the following: (i) "target customers who behave like your most valuable customers and spend your ad budget more efficiently and effectively[,]"[88] (ii) "refine ad targeting[,]"[89] and (iii) "target your ads based on customers' current email engagement."[90]  Defendant uses Bloomreach for such marketing, advertising, and analytics purposes.

(iv)    *Mux Data SDK and API*

75.    According to Mux, Mux Data allows clients like Defendant to "get the data you need at world-leading scale so you can understand streaming analytics, monitor user engagement, and improve the quality of experience (QoE) for your viewers."[91]  Specifically,

---

[85] BLOOMREACH, DATA AND ANALYTICS, https://www.bloomreach.com/en/products/engagement/marketing-intelligence-and-ai/data-and-analytics-tools.

[86] *Id.*

[87] *Id.*

[88] BLOOMREACH, CLTV BASED LOOKALIKE TARGETING FOR PAID ADS, https://www.bloomreach.com/en/products/engagement/plug-and-play/cltv-based-lookalike-targeting-for-paid-ads.

[89] BLOOMREACH, PAID AD OPTIMIZATION USING AUDIENCE PREDICTIONS, https://www.bloomreach.com/en/products/engagement/plug-and-play/paid-ad-optimization-using-audience-predictions

[90] BLOOMREACH, PAID ADS OPTIMIZED FOR EMAIL ENGAGEMENT, https://www.bloomreach.com/en/products/engagement/plug-and-play/paid-ads-optimized-for-email-engagement.

[91] MUX, DATA, https://www.mux.com/data.

"Mux Data gives you insight into video engagement and Quality of Experience using client-side SDKs for your player."[92]

76.    Mux allows its clients, like Defendant, to "[t]rack your video engagement and performance[,]" and "[i]ntegrate an SDK to start tracking video views."[93]  SDKs can be integrated into, *inter alia*, web video players.[94]  This gathered information is used for marketing and advertising.

77.    First, this information is used to enable Mux clients, like Defendant, "to make data-driven decisions on how they approach ads."[95]  This is because "advertising ... impacts streaming video platforms, both the impact on viewer experience and how Quality of Experience (QoE) influences the revenue that advertising generates."[96]

78.    Gathered information is also used for analytics.  "By knowing how long viewers are watching ads and content, platforms can adjust ad placement, duration, and frequency to maximize ad revenue."[97]  With Mux Data, clients, like Defendant, can "[e]xport raw video view data" for "processing and analysis."[98]

---

[92] MUX, INTRODUCTION TO MUX DATA, https://www.mux.com/docs/guides/data.

[93] *Id.*

[94] *See, e.g.*, MUX, MONITOR HTML5 VIDEO ELEMENT, https://www.mux.com/docs/guides/monitor-html5-video-element ("This guide walks through integration with any *HTML5 video player* to collect video performance metrics with Mux data. Use this if Mux does not have an SDK specific for your player.") (emphasis added).

[95] Justin Sanford, *Are Your Ads Worth It? - How to Measure the Effect Your Preroll Ads Have on Viewer Experience*, MUX (June 16, 2017), https://www.mux.com/blog/are-your-ads-worth-it-how-to-measure-the-effect-your-preroll-ads-have-on-viewer-experience.

[96] Steven Lyons, *Don't press skip: Introducing new ad QoE metrics*, MUX (Apr. 12, 2024), https://www.mux.com/blog/don-t-press-skip-introducing-new-ad-qoe-metrics.

[97] *Id.*

[98] MUX, EXPORT RAW VIDEO VIEW DATA, https://www.mux.com/docs/guides/export-raw-video-view-data.

79.    This is done through the "Data API."[99]  With Mux, clients, like Defendant, can track "[a]d [m]etrics and [d]imensions" through "Mux API Value[s]."[100]  Mux API Values include but are not limited to "ad_break_count[,]" or "[t]he number of times that the player entered an ad break[;]" "ad_exit_before_start_percentage[,]" or the "[p]ercentage of views that contain ads that encountered an ad exit before start[;]" and "ad_exit_before_start_count[,]" or "[t]he number of times that the viewer exited before the ad started playback[.]"[101]

80.    Defendant uses the Mux Data SDK and API for such advertising and analytics purposes.

**C.    Defendant Knowingly Discloses Class Members' PII and Video-Viewing Information to Meta, Google, Bloomreach, and Mux**

81.    Based on the above, it is abundantly clear that Defendant *intentionally* and *knowingly* discloses Tennis TV Website users' personally identifiable information and video-viewing information to Meta, Google, Bloomreach, and Mux.

82.    First, as outlined above, Defendant "knew that [Tennis TV] was collecting data from users that identified personalized information about them because, in exchange for the data, [Meta, Google, Bloomreach, and Mux] provided [Defendant] with analytics allowing [Defendant] to provide advertisements tailored to specific users." *Saunders v. Hearst Television, Inc.*, 2024 WL 126186, at *4 (D. Mass. 2024).

83.    Indeed, Defendant admits in the Tennis TV Cookie Policy—which is not "a form distinct and separate from any form setting forth other legal or financial obligations of the

---

[99] MUX, MUX DATA FAQs, https://www.mux.com/docs/guides/mux-data-faqs ("[A]ll Mux Data views and metrics are all available through the Data API. Raw video view data can be exported via the API.").

[100] MUX, EXPORT RAW VIDEO VIEW DATA, https://www.mux.com/docs/guides/export-raw-video-view-data.

[101] MUX, EXPORT RAW VIDEO VIEW DATA, https://www.mux.com/docs/guides/export-raw-video-view-data.

consumer" pursuant to 18 U.S.C. § 2710(b)(2)(B)(i)—that "[t]he particular cookies we use on

[Tennis TV] are as follows: … ***Analytics cookies*** help us understand how often customers use

our apps, what videos they watch and highlight areas where can improve areas such as

navigation. The data stored by these cookies links your browsing activity to your Tennis TV

account. ... ***Performance cookies*** ... help us ... highlight areas where we can improve areas such

as ... marketing campaigns. ... ***Targeting or advertising cookies*** collect information about your

browsing habits in order to make advertising more relevant to you and your interests."[102]

    84.    Second, the code for the Meta Pixel, Google Analytics, Bloomreach Javascript

SDK, and Mux Data SDK and API did not spontaneously appear on the Tennis TV Website.

Instead, the third parties' code was purposefully installed by Defendant into the HTML

documents and/or other libraries defining the contents of their Website.  In order to obtain the

third parties' code for the Meta Pixel, Google Analytics, Bloomreach SDK, and Mux Data SDK

and API, Defendant needed to contract with Meta, Google, Bloomreach, and Mux specifically

for those third parties' marketing, advertising, and analytics services.  Meta explains: "to set up a

pixel[,] … set up the pixel base code on your website."[103]  Google explains: to "set up Google

Analytics for [a] website or app … [y]our first step is to set up an Analytics account[.]"[104]

Bloomreach explains: "To integrate your website with Bloomreach Engagement using our

Javascript SDK, you need to copy-paste the integration snippet into the header of your

---

[102] TENNIS TV, COOKIE POLICY, https://www.tennistv.com/cookie-policy (emphasis added).

[103] META, HOW TO SET UP AND INSTALL A META PIXEL,
https://www.facebook.com/business/help/952192354843755?id=1205376682832142.  *See also*
META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started
("Before you can install the Pixel, you will need your Pixel's base code, which you can find in
the Ads Manager > Events Manager.").

[104] GOOGLE, [GA4] SET UP ANALYTICS FOR A WEBSITE AND/OR APP,
https://support.google.com/analytics/answer/9304153?hl=en.

webpage."[105]  Mux explains:  "[e]very request to the API is authenticated via an Access Token, which includes the ID and the secret key."[106]  On information and belief, Mux Access Tokens are generated at the request of Mux clients, like Defendant.[107]

85.    Therefore, Defendant knowingly and intentionally provides personal information and video-viewing information to Meta, Google, Bloomreach, and Mux for marketing, advertising, and analytics services.

## VIII.  EXPERIENCE OF PLAINTIFF

86.    Plaintiff Sotirios Stamatis is a resident and citizen of Millers Falls, Massachusetts. In or around February 2022, Plaintiff created and paid for a Tennis TV account.  Shortly thereafter, Plaintiff began using the Tennis TV Website and his Tennis TV account to watch various pre-recorded videos.  Plaintiff most recently watched a pre-recorded video on the Website using his Tennis TV account in or around March 2025.

87.    By subscribing to and paying for Tennis TV, Plaintiff received access to watch unlimited Tennis TV live and pre-recorded videos, in addition to other benefits.

88.    At all relevant times, Plaintiff never consented to, agreed to, or otherwise permitted Defendant to disclose his PII and video-viewing information to third parties, including Meta, Google, Bloomreach, and Mux.

89.    Likewise, Defendant never gave Plaintiff the opportunity to prevent the disclosure of his PII and video-viewing information to third parties, including Meta, Google, Bloomreach, and Mux.

---

[105] BLOOMREACH, INTEGRATION,
https://documentation.bloomreach.com/engagement/docs/integration.

[106] MUX, MAKE API REQUESTS, https://www.mux.com/docs/core/make-api-requests.

[107] MUX, ACCESS TO ALL YOUR DATA VIA THE REAL-TIME DASHBOARD API,
https://www.mux.com/blog/access-to-all-your-data-via-the-real-time-dashboard-api.

90.     Nevertheless, each time Plaintiff viewed a pre-recorded video on the Tennis TV

Website, Defendant disclosed Plaintiff's PII and video-viewing information to Meta, Google,

Bloomreach, and Mux via the Token and Meta Pixel, Google Analytics, Bloomreach Javascript

SDK, and Token and Mux Data SDK and API, respectively.

91.     Defendant disclosed Plaintiff's: (i) Facebook browser ID value stored in the _fbp

browser cookie, and (ii) video-viewing information (including titles, IDs, and URLs of videos

watched, as well as video interactions) to Meta via the Token and Meta Pixel.  Below is an image

of Plaintiff's activity off Meta technologies, showing that the Meta Pixel received Plaintiff's data

from the Website on February 28, 2025.[108]  This image was retrieved from Plaintiff's Facebook

account, which he created on or around September, 2007.  The day pictured, February 28, 2025,

was but one time that Plaintiff accessed his Facebook account on the same web browser that he

used to access the Tennis TV Website.



92.     Defendant disclosed Plaintiff's: (i) hashed e-mail address, (ii) Google Analytics

client ID, and (iii) video-viewing information (including titles, IDs, and URLs of videos

watched) to Google via Google Analytics.

---

[108] META, REVIEW YOUR ACTIVITY OFF META TECHNOLOGIES,
https://www.facebook.com/help/2207256696182627.

93.     Defendant disclosed Plaintiff's: (i) hashed e-mail address, (ii) video-viewing information (including IDs and URLs of videos watched) to Bloomreach via the Bloomreach Javascript SDK.

94.     Defendant disclosed Plaintiff's: (i) email and full name and (ii) video-viewing information (including titles, IDs, and URLs of videos watched, as well as video interactions) to Mux via the Token and Mux Data SDK and API.

95.     Using this information, Meta, Google, Bloomreach, and Mux were able to identify Plaintiff and attribute his video viewing records to an individualized profile of Plaintiff. Indeed, even an ordinary person could identify Plaintiff using the data Defendant disclosed to Meta, Google, Bloomreach, and Mux.  Meta, Google, Bloomreach, and Mux compiled Plaintiff's PII and activity on the Tennis TV Website (including video-viewing information), which Defendant used and continue to use for marketing, advertising, and analytics purposes.

## PARTIES

96.     Plaintiff Sotirios Stamatis is, and has been at all relevant times, a resident of Millers Falls, Massachusetts and has an intent to remain there, and is therefore a citizen of Massachusetts.

97.     Defendant ATP Media Operations Ltd. is a corporate entity incorporated in and with its principal place of business in a foreign state—United Kingdom.  Defendant ATP Media Operations Ltd. operates Tennis TV, which is used throughout California and the United States.

## JURISDICTION AND VENUE

98.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

99.     This Court also has subject matter jurisdiction over this civil action pursuant to 28

U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

100.    This Court has personal jurisdiction over Defendant because it collected and disseminated the personally identifiable information and video-viewing information giving rise to this lawsuit in this District.  Moreover, Defendant specifically and knowingly targeted Massachusetts residents by selling subscriptions to the Tennis TV video service to persons whom Defendant knows to reside in Massachusetts (based on billing information provided to Defendant at checkout).[109]  The Court also has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(2) because this claim arises under federal law and Defendant has purposefully availed itself of the privilege of doing business in the United States.

101.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District.  Further, as a foreign corporation, Defendant may be sued in any judicial district.  28 U.S.C. § 1391(c)(3).

## CLASS ALLEGATIONS

102.    **Class Definition:**  Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who created Tennis TV accounts, used the Website to watch pre-recorded videos, and subsequently had their PII and video-viewing information transmitted to a third party without consent (the "Class").

103.    Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including

---

[109] *See* TENNIS TV, REGISTER, https://www.tennistv.com/register; TENNIS TV, SUBSCRIBE | CHOOSE YOUR PLAN, https://www.tennistv.com/subscribe.

through the use of multi-state subclasses.

104.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Tennis TV and the worldwide popularity of the sport of tennis, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

105.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

> (a)    whether Defendant collected Plaintiff's and Class Members' PII;

> (b)    whether Defendant unlawfully disclosed and continue to disclose Tennis TV users' PII, including their video-viewing records, in violation of the VPPA;

> (c)    whether Defendant's disclosures were committed knowingly; and

> (d)    whether Defendant disclosed Plaintiff's and Class Members' PII without consent.

106.    **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used their paid Tennis TV account on the Website to watch videos and consequently had his PII collected and disclosed by Defendant.

107.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of

the Class. Plaintiff has raised viable statutory claims, of the type reasonably expected to be raised by members of the Class, and Plaintiff will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

108.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION
### COUNT I
**Violation of the VPPA,
18  U.S.C. § 2710**

109.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

110.    Defendant is a "video tape service provider" as defined by the VPPA because it "engages in the business, in or affecting interstate or foreign commerce, of rental, sale, or

delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as Defendant provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via Tennis TV.

111.    Plaintiff and members of the Class are "consumers" as defined by the VPPA because they created Tennis TV accounts with their personal information such as first and last name, date of birth, country, and e-mail address, paid for their subscriptions, obtained access to exclusive video content as a result, and subsequently watched videos through those accounts on the Tennis TV Website.  18 U.S.C. § 2710(a)(1).  Under the VPPA, this means that they were "subscriber[s]" of "goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).

112.    Plaintiff and members of the Class viewed pre-recorded videos using the Tennis TV Website.  During these occasions, Defendant disclosed Plaintiff's and Class Members' PII to third parties.  Specifically, Defendant disclosed Plaintiff's: (i) Facebook browser ID value stored in the _fbp browser cookie, and (ii) video-viewing information (including titles, IDs, and URLs of videos watched, as well as video interactions), and (iii) email and full name to Meta via the Token and Meta Pixel.  Defendant disclosed Plaintiff's: (i) hashed e-mail address, (ii) Google Analytics client ID, and (iii) video-viewing information (including titles, IDs and URLs of videos watched) to Google via Google Analytics.  Defendant disclosed Plaintiff's: (i) email, (ii) video-viewing information (including IDs and URLs of videos watched), and (iii) page visiting time to Bloomreach via the Bloomreach Javascript SDK.  Defendant disclosed Plaintiff's (i) email and full name, (ii) video-viewing information (including titles, IDs, and URLs of videos watched, as well as video interactions) to Mux via the Token and Mux Data SDK and API.

113.    The information disclosed by Defendant constitutes "personally identifiable information" because it makes it "reasonably and foreseeably likely to reveal which [Tennis TV] videos [Plaintiff and members of the Classes] [] obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016); *see also* 18 U.S.C. § 2710(a)(3).  Indeed, the information disclosed by Defendant to Meta, Google, Bloomreach, and Mux enables even an ordinary person to identify which specific videos were watched by Plaintiff and specific members of the Class.

114.    Defendant's transmissions of Plaintiff's and Class Members' PII to Meta, Google, Bloomreach, and Mux via the Meta Pixel, Google Analytics, Bloomreach Javascript SDK, and Mux Data SDK and API, respectively, constitute "knowing[] disclosures" of Plaintiff's and members of the Classes' "personally identifiable information" to a person as proscribed by the VPPA.  18 U.S.C. § 2710(a)(1).  Defendant "knew that [Tennis TV] was collecting data from users that identified personalized information about them because, in exchange for the data, [Meta, Google, Bloomreach, and Mux] provided [Defendant] with analytics allowing [Defendant] to provide advertisements tailored to specific users." *Saunders,* 2024 WL 126186, at *4.

115.    Plaintiff and the Class Members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties, including Meta, Google, Bloomreach, and Mux.

116.    Nor were Defendant's disclosures of Plaintiff's and Class Members' PII made in the "ordinary course of business" as the term is defined by the VPPA.  Defendant's disclosures to Meta, Google, Bloomreach, and Mux were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

117.    On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief;

(ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class

by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII;

(iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. §

2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

judgment against Defendant, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For an award of statutory damages to the extent available;

(e)    For punitive damages, as warranted, in an amount to be determined at trial;

(f)    For prejudgment interest on all amounts awarded;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated:  March 20, 2025                Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ Yitzchak Kopel*
        Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (BBO # 716245)
Max S. Roberts (*Pro Hac Vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
        mroberts@bursor.com

*Attorneys for Plaintiffs*